Ray A. and Dessie T. Noland v. Commissioner.
Noland v. Commissioner
Docket No. 40531.
United States Tax Court
1953 Tax Ct. Memo LEXIS 126; 12 T.C.M. (CCH) 1003; T.C.M. (RIA) 53288; August 31, 1953
*126 Held, the taxpayers received taxable income upon the purchase of stock in the petitioner's employer-corporation in the amount of the differential between the price paid for the stock and its fair market value on the date of delivery. Karl M. Ruppenthal, Esq., 1711 Guinda Street, Palo Alto, Calif., for the petitioners. R. G. Harless, Esq., for the respondent. VAN FOSSAN Memorandum Findings of Fact and Opinion The respondent determined a deficiency in income tax against the petitioners for the year 1945 in the amount of $888.34. The *127 questions presented in this proceeding are whether the petitioners are to be taxed upon the receipt of shares of stock of Trans-World Airlines, Inc. and whether the statute of limitations barred the deficiency determined. Findings of Fact The facts are found as stipulated. The following pertinent facts appear. The petitioners are husband and wife residing at Los Gatos, California. They filed a joint income tax return for the year 1945. Ray A. Noland, hereinafter sometimes referred to as petitioner, was employed as a pilot for Transcontinental and Western Air, Inc., now Trans World Airlines, Inc., hereinafter referred to as TWA, on June 1, 1936, and continuously remained so employed until June 8, 1942 at which time he entered the armed services as a pilot. TWA was incorporated in 1934 and lost money in that and the following year. In 1937, TWA expanded greatly. In order to obtain the amounts of new capital needed, the corporation gave to stockholders of record on December 17, 1936, the right to subscribe to an additional 207,711 shares of capital stock at a price of $12 per share on the basis of one share for each three shares owned on the record date. The right to subscribe expired *128 on January 6, 1937. As a result of the above-described subscription, the company received net proceeds of $2,300,000, most of which was used for capital expansion in plants, equipment and maintenance facilities. TWA then offered 50,000 shares to its employees under an arrangement which provided that the price of such stock sold to employees in any given year should be determined by taking 65 per cent of the average December price on the New York Stock Exchange. The plan provided that payment for the stock would be made in advance over a five-year period by means of payroll deductions and that the payments should be made entirely by the employee, the company making no contributions to the purchase price. Dividends were to be credited against the purchase price but no dividends were declared and none credited against the cost of the stock. The crediting of any dividends would have been conditioned upon the completion of payment for the stock. Officials of TWA strongly recommended that employees participate in the plan. In accord with the plan, Ray Noland was given the right to purchase 22 shares in 1937, 14 shares in 1938, and 12 shares in 1939, which option he exercised each year. *129 Delivery of the shares was to be made in 1942, 1943 and 1944, respectively. Under the plan, he would have received delivery of the shares in those years. The stock in question was purchased and paid for pursuant to the plan at a price per shares as follows: Class of 1938 - 22 shares at $3.75
$82.50
Paid prior to June 8, 1942
72.61
Balance due
$ 9.89
Class of 1939 - 14 shares at $5.85
$81.90
Paid prior to June 8, 1942
51.68
Balance due
30.22
Class of 1940 - 12 shares at $7.06
$84.72
Paid prior to June 8, 1942
35.25
Balance due
49.47
Balance due on stock as of June 8, 1942
$89.58 The taxpayers still own this stock and have not sold or otherwise disposed of it, the petitioner having paid the balance due on the stock on October 10, 1945, and delivery of the stock having been made on December 6, 1945. Prior to and subsequent to the introduction of the employee stock purchase plan, the petitioner was a regular pilot for TWA flying regular scheduled runs on TWA routes. Neither the nature nor amount of his work changed after the plan was put into effect. The plan stated: "1. Purpose of the Plan. "For the purpose of rewarding those officers *130 and employees of Transcontinental & Western Air, Inc. (hereinafter called the 'Company') who, by their loyalty, ability and initiative, have contributed and in the future do contribute to the successful operation of the business, the Board of Directors of the Company, with the approval of its stockholders, has adopted this Plan, which shall be known as THE TWA EMPLOYEES STOCK PURCHASE PLAN. "2. Officers and Employees to be Included in the Plan. "On or before the first day of December in each year, while this Plan shall be in effect, the President shall furnish to the Board of Directors recommendations as to the officers and employees of the Company (not including Directors who are not also officers or employees), who should be accorded the privilege of participating in the Plan during the succeeding year; provided, however, that such recommendations for the year 1937 shall be made on or before May 1, 1937. The Board of Directors shall thereon vote on such recommendations, with such amendments as it may deem advisable or it may, in its absolute discretion, refrain from authorizing any participation in the Plan for the succeeding year. "3. Purchase Privilege. "Each of the officers *131 and employees of the Company so designated by the Board of Directors shall have the privilege of subscribing to a plan under which he shall have an option to purchase shares of common stock of the Company having a purchase price, determined as hereinafter provided, equal to a specified percentage (fixed by the Board of Directors for each year) not in excess of twenty per cent (20%) of the annual salary of such officer or employee as it is carried on the books of the Company on January first of the year in which the subscription is made. The number of shares which may be thus optioned to such officer or employee shall be determined by dividing the purchase price for such year, as hereinafter set forth, into the sum representing the specified percentage, as fixed by the Board of Directors for that year, of the salary of such officer or employee, and if the result shall include a fraction of a share, such officer or employee shall have the option to purchase only the whole number of shares remaining after the elimination of such fraction. "The total number of shares which may be subscribed for and issued pursuant to this Plan shall not exceed fifty thousand (50,000) shares of the Common *132 Stock of the Company as presently constituted." Any employee who had been with the company one year on January 1, 1938, could buy stock under the plan if he wished, as a participant in the class of 1938 as described in the plan. Some TWA pilots purchased stock under the plan while others did not. The pilots who purchased stock, and others who did not, flew the same flights, did substantially the same amount of work and were paid the same rates of compensation. The Airline Pilots Association, hereinafter sometimes referred to as ALPA, is a labor union. The petitioner has been a member of this association since his employment with TWA. This association was certified under the Railway Labor Act and the Civil Aeronautics Act as the exclusive bargaining agent for all the pilots employed by TWA. As a member of a union recognized as a bargaining agent, the petitioner waived his rights to deal individually with his employer as to compensation and working conditions and by law the employer had no right to negotiate as to working conditions or compensation with the individual employee. The agreement between TWA and ALPA regarding compensation to be paid pilots provides for this compensation *133 to be paid in cash and does not make provision for stock options. Pilots who bought stock under the plan in question and those who failed to do so were otherwise paid exactly the same rate of compensation under the agreement between TWA and ALPA. Payments for stock purchased under the plan were paid for five years in advance into a fund over which TWA had exclusive control. TWA could hold the funds in cash, deposit them at interest or buy securities (including their own) with the capital so raised. Under the agreement, TWA received all interest which would accrue to the funds thus advanced. In subscribing to the plan, the petitioner agreed to give up control over the advanced funds and to forfeit all interest thereon whether or not he exercised the option to buy stock. The price range and the earnings per share of TWA stock on the New York Stock Exchange for the years involved were as follows: Earnings
Year
Low
High
Per Share
1937
4
22 3/8
(1.16)
1938
4
10 5/8
(0.85)
1939
6 1/4
12 7/8
0.12
1940
10 1/4
21 7/8
(0.09)
1941
8 1/2
17 1/
4(0.46)
1942
7 5/8
18 1/4
2.08
1943
15 1/4
25 3/8
1.93
1944
17 1/2
29
2.56
1945
26
79$1.67
*134 From the time of its incorporation in 1934, TWA has paid only one dividend - 25 cents per share in 1936. On August 15, 1944, the board of directors of TWA amended the plan to provide for deferred payments by employees for military and other leaves of absence. The employee participating in the plan could take any or all of the shares set aside for him in each year or he could refuse to participate. The plan provided that the board of directors had the right to terminate the plan at any time without notice, the absolute discretion to determine the purchase price of the stock, and the right to construe the provisions of the plan and the purchase agreements thereunder. The plan also provided that if an employee decided not to purchase the stock that he had agreed to buy, he was required to take affirmative action and notify the company in writing within a stipulated time. With certain exceptions, employees could not anticipate payments to the fund. At any period prior to 30 days before the expiration of the five year period of payment, any participating employee could withdraw from the plan with respect to part or all of the shares for which he had subscribed. He would receive back *135 all the moneys paid in by him without interest. Notice in writing that he did not wish to exercise his option was required or he would be deemed to have exercised the option with respect to all of such shares. Prior to full payment and issuance of shares, the employee was not a stockholder and had none of the stockholder's rights and privileges. If the employee withdrew from the plan, he would forfeit any dividends that might have been declared or any stock rights that might have been issued. Neither dividends nor stock rights was declared during the life of the plan. In case of death of the employee prior to full payment, his personal representative had all the options available to the employee. If, prior to full payment, the employee ceased to be employed for any reason other than death, or if he voluntarily withdrew from the plan or assigned, transferred, or sold his rights under the plan, his rights were terminated and he would be returned the money paid in without interest. After the amendment of the plan in 1944 providing for participating employees going on leave of absence, a moratorium on unpaid balances was declared, and the employee could pay up part or all of the balance *136 and get his stock if he did not return. If he returned, he could either resume monthly payments or pay the entire balance within 90 days and get his stock. While on leave of absence, the employee could continue his monthly payments. For the year 1945, TWA claimed a deduction as compensation pay of the difference between petitioners' cost of $249.12 and the stock market quoted price, or $3,326.88. The company also withheld income tax on this amount and filed a statement to this effect which was also attached to the petitioners' return. In 1945, petitioner reported income of $4,936.35. The respondent's notice of deficiency was mailed to the taxpayers on February 26, 1952. On December 20, 1950, the taxpayers and the respondent executed a consent extending the period of limitation for the taxable year ended December 31, 1945, to June 30, 1951, under the provisions of section 275(c) of the Internal Revenue Code. On March 3, 1951, the taxpayers and the respondent executed a further consent extending the statutory period to June 30, 1952. The option to purchase the stock in question at the price fixed in the plan constituted compensation to the petitioner. *137 Opinion VAN FOSSAN, Judge: The initial question to be determined in this proceeding is whether the petitioner obtained the stock in his employer-corporation as a bargain purchase or as compensation for services. The option granted to the petitioner came into existence prior to the regulatory amendment made effective as of February 26, 1945, and we are not concerned with its application in this instance. See Otto C. Schultz, 17 T.C. 695. The controversy in the present proceeding relates to the issue of whether the petitioner was granted this stock purchase option as compensation. The petitioner had worked for TWA since June 1936. In 1937, he, along with other employees with a year or more of service, was given an option to purchase shares of TWA's common stock at 65 per cent of the average market price as set forth in the plan. The petitioner was given the right to purchase 22 shares in 1937, 14 shares in 1938, and 12 shares in 1939 all of which he exercised. Delivery of these shares was to be made in 1942, 1943 and 1944, respectively. The petitioner was to pay $249.12 for the shares he was to receive. As of June 8, 1942, when he went into the armed services he had *138 paid all of this amount except $89.58. This balance was paid on October 10, 1945. Delivery of the 48 shares was made on December 6, 1945. The employee stock purchase plan stated that its purpose was to reward officers and employees for their loyalty, ability and initiative which have contributed and will contribute to the successful operation of the business. The employees qualified to participate in the plan were those with one year or more of service. The differential between the option price and the market price was substantial and creates the impression that compensation was intended despite the fact that the petitioner's duties were not materially altered. Cf. Delbert B. Geeseman, 38 B.T.A. 258. When delivery of the shares was made in 1945, TWA withheld income tax from the petitioner's salary based upon the differential between the option price and the market price on the date of delivery. TWA also claimed a deduction in its 1945 tax return for this differential as compensation paid to the petitioner. Although the petitioner's employer had entered into an agreement with ALPA with regard to the compensation paid pilots, we are of the opinion that such an agreement *139 does not preclude this Court from determining that the option was granted as compensation for past and future services as the plan itself states. Section 22(a) of the Internal Revenue Code[1] includes gains, profits, and income derived from compensation for personal services of whatever kind and in whatever form paid. The employee stock purchase plan sets forth its purpose to reward officers and employees for their past and future contributions by their loyalty, ability, and initiative to the successful operation of the business. The contributions made were services rendered in their employment. There was a vital causal connection between the petitioner's employment and his services and the purchase of the stock at favorable prices. Wanda V. Van Dusen, 8 T.C. 388, aff'd 166 Fed. (2d) 647. The petitioner's employer treated the option in all respects as one of compensation to employees with a year or more of service. The plan was limited to such employees although the stock could still be purchased if the employee went on leave of absence and *140 could also be purchased by his personal representative after death. The petitioner contends that TWA's purpose in putting this plan into effect was to raise capital at a time when funds were sorely needed. It may well be that TWA desired to raise additional capital following the prior grant to stockholders of an option to purchase stock in 1936. Such a purpose was not inconsistent with the primary purpose of paying additional compensation to selected employees. *141 The number of shares which could be purchased by an employee was fixed on the basis of a specified percentage of his salary. Thus, the payments made by the employees towards the purchase price were proportionate to the employee's compensation and further demonstrate the compensatory nature of the stock options. U.S. Steel Corp., 2 T.C. 430. Considering all the factors presented by the evidence, we hold that the capital shares in TWA stock were received by the petitioner as compensation for services. The differential between the price paid for the stock and the fair market value on the date of delivery is $3,326.88. See Commissioner v. Smith, 324 U.S. 695. Inasmuch as this amount is more than 25 per cent of the gross income shown on the petitioner's return, section 275(c)[2] and the consent agreement executed in connection therewith are applicable. *142 Decision will be entered for the respondent. Footnotes
1. SEC. 22. GROSS INCOME. (a) General Definition. - "Gross income" includes gains, profits, and income derived from salaries, wages, or compensation for personal service (including personal service as an officer or employee of a State, or any political subdivision thereof, or any agency or instrumentality of any one or more of the foregoing), of whatever kind and in whatever form paid, or from professions, vocations, trades, businesses, commerce, or sales, or dealings in property, whether real or personal, growing out of the ownership or use of or interest in such property; also from interest, rent, dividends, securities, or the transaction of any business carried on for gain or profit, or gains or profits and income derived from any source whatever. * * *↩
2. SEC. 275. PERIOD OF LIMITATION UPON ASSESSMENT AND COLLECTION. Except as provided in section 276 - * * *
(c) Omission from Gross Income. - If the taxpayer omits from gross income an amount properly includible therein which is in excess of 25 per centum of the amount of gross income stated in the return, the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time within 5 years after the return was filed.↩